[Cite as *Lang v. Lang*, 2014-Ohio-4124.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

DELMAR R. LANG, et al.

     Appellees

     v.

MELANIE L. LANG

     Appellant

C.A. No.     13CA0054

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No.     12-DR-0267

DECISION AND JOURNAL ENTRY

Dated: September 22, 2014

BELFANCE, Presiding Judge.

{¶1} Appellant, Melanie Lang ("Mother"), appeals from the judgment of the Wayne County Court of Common Pleas, granting visitation rights to Appellees, Delmar Lang ("Grandfather") and Susan Lang ("Grandmother") (collectively, "Grandparents"). This Court affirms.

I.

{¶2} Mother and Kyle Lang ("Father") were married in June 2002 and had four children during the course of their marriage: I.L., born in June 2003; H.L, born in August 2004; M.L., born in September 2005; and G.L., born in September 2007. Mother was an optometrist and Father was a physician and part-time farmer. The two divorced in July 2010, and Mother was named the children's primary residential parent and legal custodian. Mother and the children moved approximately ten minutes away and Father remained on the farm. In May 2011, Father was killed in a farming accident.

{¶3}   While Mother and Father were still married, the two lived next door to Grandparents, Father's parents, and the four children saw them several times a week. Even after Mother and Father divorced, the children would see Grandparents often. The children would visit with Grandparents when they were with Father, and Mother later asked Grandparents to watch the children two days a week after school. After Father's death, however, Mother no longer asked Grandparents to watch the children. Instead, Mother took the children to see Grandparents about once a week.

{¶4}   Issues with Father's estate soon caused the parties' relationship to suffer. Additionally, Mother observed that the children were often sad after spending time with Grandparents. Grandparents had several physical reminders of Father in and around their house, and Mother believed that Grandparents' grief and anger over the loss of their son was affecting the children. Several incidents that occurred around November 2011 combined with the children's reaction to spending time with Grandparents caused Mother to stop all interaction between the children and Grandparents. Mother served Grandparents with a no trespass letter and refused to allow them to see the children.

{¶5}   Subsequently, Grandparents filed a complaint for visitation rights. Mother filed an answer, and the court appointed a guardian ad litem to protect the interests of the children. A two-day hearing took place before a magistrate. After the hearing, the magistrate issued a decision in which he awarded Grandparents visitation. The trial court adopted the magistrate's decision and awarded Grandparents one visit per month with the children for four hours. The judgment provided that the first four visits would take place at Mother's home in Mother's presence. Visits beyond the initial four-month period would take place at Grandparents' home or a location of their choosing with Mother's presence contingent upon their invitation.

{¶6}     Both parties filed objections to the magistrate's decision.  Subsequently, the court overruled the objections and entered judgment in accordance with its earlier judgment entry. The court agreed to stay its judgment for the purpose of allowing Mother to appeal.

{¶7}     Mother now appeals from the court's judgment and raises three assignments of error for our review.  For ease of analysis, we consolidate several of the assignments of error.

II.

ASSIGNMENT OF ERROR I

THE MAGISTRATE'S PROPOSED DECISION FAILS TO AFFORD SPECIAL WEIGHT TO THE WISHES OF THE MOTHER OF THE CHILDREN REGARDING FUTURE CONTACT BETWEEN THE CHILDREN AND THEIR PATERNAL GRANDPARENTS AND IT VIOLATES MOTHER'S CONSTITUTIONAL RIGHTS FOR A FIT PARENT TO RAISE [HER] CHILDREN AS [SHE] DEEM[S] APPROPRIATE FREE OF GOVERNMENTAL INTERFERENCE AS AFFORDED TO HER UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.  THE STATE OF OHIO HAS NO COMPELLING, SUBSTANTIAL, OR LEGITIMATE INTEREST IN ORDERING GRANDPARENT VISITATION OVER A FIT CUSTODIAL PARENT'S OBJECTIONS.

ASSIGNMENT OF ERROR II

THE MAGISTRATE'S PROPOSED FINDINGS INCLUDE THE FOLLOWING STATEMENT: "[T]HE EVIDENCE SHOWED THE BENEFIT THE LANG CHILDREN CAN RECEIVE FROM THE RESTORATION OF THE GRANDPARENT-GRANDCHILDREN RELATIONSHIP IS SUBSTANTIAL." THIS FINDING BY THE HEARING OFFICER IS WITHOUT SUPPORT AND NO EVIDENCE WAS SUBMITTED AT TRIAL TO SUBSTANTIATE THIS FINDING.  IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶8}     In her first and second assignments of error, Mother argues that the magistrate failed to afford her opinion special weight and incorrectly found that her children would receive a substantial benefit from a restored relationship with Grandparents.  Because claims of trial court error may not be based upon a magistrate's findings or proposed decision, we overrule Mother's first and second assignments of error.

**{¶9}** Even if a magistrate's finding is "contrary to the evidence contained in the record, this Court has previously noted that, '[a]ny claim of trial court error must be based on the actions of the trial court, not on the magistrate's findings or proposed decision.'" *Wallace v. Wallace*, 195 Ohio App.3d 314, 2011-Ohio-4487, ¶ 14 (9th Dist.), quoting *Knouff v. Walsh-Stewart*, 9th Dist. Wayne No. 09CA0075, 2010-Ohio-4063, ¶ 6. The trial court here did not expressly adopt the magistrate's decision or any of his findings. Although Mother specifically objected to the magistrate's decision on the bases outlined above, she has not argued that the trial court erred by overruling her objections. *See* App.R. 16(A)(7). Nor has she argued that the trial court failed to (1) undertake an independent review of the record, *see* Civ.R. 53(D)(4)(d), or (2) comply with her written request for a ruling with findings of fact and conclusions of law. Her assignments of error present us with a direct challenge to the magistrate's findings and proposed decision. Because a claim of error on appeal cannot be based on a magistrate's findings or proposed decision, *Wallace* at ¶ 14, Mother's first and second assignments of error are overruled on that basis. *See Knouff* at ¶ 6.

ASSIGNMENT OF ERROR III

> THE GRANDPARENTS HEREIN FAILED TO MEET THEIR BURDEN OF PROOF TO PROVIDE EVIDENCE IN SUPPORT OF VISITATION BEING THE BEST INTERESTS OF THESE CHILDREN AT A LEVEL SUFFICIENT TO ABUT THE PRESUMPTION OF THE RIGHT OF A FIT PARENT TO MAKE THE DECISION FOR THEIR CHILDREN; HENCE, THE TRIAL COURT'S DECISION WAS AN ABUSE OF [ITS] DISCRETIONARY POWER.

**{¶10}** In her third assignment of error, Mother challenges the trial court's decision to award Grandparents visitation. She argues that, because Grandparents failed to show visitation was in her children's best interest, the court abused its discretion by awarding them visitation.

{¶11}  Generally, "[w]hen reviewing an appeal from the trial court's ruling on objections to a magistrate's decision, this Court must determine whether the trial court abused its discretion in reaching its decision." *Daniels v. O'Dell*, 9th Dist. Summit No. 24873, 2010-Ohio-1341, ¶ 10. "In so doing, we consider the trial court's action with reference to the nature of the underlying matter." *Tabatabai v. Tabatabai*, 9th Dist. Medina No. 08CA0049-M, 2009-Ohio-3139, ¶ 18. "A trial court's decision regarding visitation rights will not be reversed on appeal except upon a finding of an abuse of discretion." *Harrold v. Collier*, 9th Dist. Wayne No. 06CA0010, 2006-Ohio-5634, ¶ 6.  An abuse of discretion implies that a trial court's decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶12}  Grandparents moved to have visitation with their four grandchildren under R.C. 3109.11.  That statute provides that if

> either the father or mother of an unmarried minor child is deceased, the court of common pleas of the county in which the minor child resides may grant * * * relatives of the deceased father or mother reasonable companionship or visitation rights with respect to the minor child during the child's minority if the * * * relative files a complaint requesting reasonable companionship or visitation rights and if the court determines that the granting of the companionship or visitation rights is in the best interest of the minor child.

R.C. 3109.11.  "[T]he trial court must use the factors set forth in R.C. 3109.051(D) when determining whether visitation is in the best interests of the child." *Adam v. Kovitch*, 9th Dist. Summit No. 26497, 2013-Ohio-1020, ¶ 8.  Those factors are

> (1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity, and with the person who requested companionship or visitation * * *;
>
> (2) The geographical location of the residence of each parent and the distance between those residences, and if the person is not a parent, the geographical location of that person's residence and the distance between that person's residence and the child's residence;

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, * * * regarding the wishes and concerns of the child as to * * * visitation by the grandparent * * *, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that the person

has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

R.C. 3109.051(D)(1)-(16). "Ohio statutes allow grandparental visitation only if it is in the grandchild's best interest." *Estate of Harrold v. Collier*, 9th Dist. Wayne No. 03CA0064, 2004-Ohio-4331, ¶ 13.

{¶13} Mother's third assignment of error challenges the court's ultimate decision to award Grandparents visitation. Mother does not take issue with the trial court's failure to address the individual factors set forth in R.C. 3109.051 in reaching its decision. Instead, Mother argues that the court's ultimate decision constitutes an abuse of discretion because Grandparents failed to demonstrate that visitation would be in the children's best interest. For purposes of clarity, we begin by outlining the evidence in the record.

{¶14} During Mother and Father's marriage, the two lived on a farm directly adjacent to Grandparents. Mother testified that Grandmother's family originally owned the entire property, but that Grandparents sold the farm to her and Father when they married. In July 2010, Mother and Father divorced, and Mother was named the children's primary residential parent and legal custodian. Father retained the farm, and Mother and the children moved to a new home. Mother stated that the new home was about a ten-minute drive from the farm.

{¶15} Mother agreed that the children saw Grandparents several times a week before she and Father separated. After the divorce, the children stayed with Father for two days every other week and often saw Grandparents on those days. Mother testified that she and Grandparents maintained a cordial relationship with one another in spite of the divorce. In fact, when her babysitter moved away in December 2010, Mother asked Grandparents to watch the children two days a week after school while she worked. Grandparents did so until May 2011, when Father died unexpectedly.

{¶16} Mother testified that Grandparents stopped watching the children after Father's death, but that she still took them to visit Grandparents about once a week. Over the next several months, however, Father's death and issues with his estate began to affect the parties' relationship. Because Father died intestate, the children inherited all of his property, including the farm that had been in Grandmother's family for a substantial period of time. Mother purchased the farm to manage it for the children, and her doing so caused tension among Father's siblings. Additional tension resulted when the probate court honored Mother's request to have her sister, Regina Murphy, named as the administrator of Father's estate rather than Grandmother. Because Grandparents removed many of Father's possessions from his home when he died, Ms. Murphy and Mother had to reclaim the items directly from Grandparents in marshaling the assets.

{¶17} As November 2011 approached, Mother testified that she also became concerned about the children spending time with Grandparents. She testified that Grandparents were sad and angry after Father's death and the children were often sad after visiting with them. She further testified that Grandparents had a lot of pictures of Father on display in the main room of their house, along with personal items like his stethoscope, coat, and hat. Additionally,

Grandparents had a large, white memorial cross in their yard, which they had strung lights across.

{¶18} In November 2011, several events caused the relationship between the parties to further deteriorate. First, an incident occurred at Grandparents' house when Mother and Ms. Murphy stopped there to retrieve certain keys for Father's property. Mother testified that her children were not with her at the time, but at least one of Father's siblings and his children were there. She testified that, during the brief visit, Father's brother came out of the house and screamed and swore at her, regarding the farm. According to Mother and Ms. Murphy, Grandparents stood by and did nothing despite the fact that their grandchildren could hear their son's outburst. According to Grandparents, they intervened and told their son to walk away and stop yelling.

{¶19} Another incident later occurred at Grandparents' house when Ms. Murphy went there to retrieve several items of property. Ms. Murphy testified that Grandmother "made some nasty comments" about Mother, including that Mother had not been a good wife and was not a good mother. Ms. Murphy also recalled that Grandfather became angry with her when she told him that her step-father would be arriving with a truck and trailer to pick up Father's motorcycle. Ms. Murphy testified that Grandfather swore at her and continued yelling and swearing when her step-father arrived with his truck. Ms. Murphy testified that H.L., who was seven at the time, was in the truck while Grandfather screamed at her. During his testimony, Grandfather conceded that he might have raised his voice "a little bit" during the encounter, but denied having used any inappropriate language.

{¶20} A third incident took place the weekend of Thanksgiving. Mother testified that she took the children to the farm to remove some furniture from the house. She testified that, as

they were moving furniture, Grandfather walked over from his house and began screaming that she could not have certain items. Mother testified that, as Grandfather yelled, the children "were all standing there saying * * * Paw-paw, Paw-paw and [Grandfather] just totally ignored them." Grandfather eventually left at Mother's request, but Mother testified that a sheriff arrived about half an hour later to verify that she was within her right to take the property.

{¶21} Mother testified that all of the incidents that occurred in November 2011, combined with her children's reaction to their visits with Grandparents, caused her to stop all contact between the children and Grandparents. Mother specified that she did not believe it was healthy for the children to continue visiting with Grandparents because they needed time to heal from the death of their son. Mother agreed that it would be important for the children to have a relationship with Grandparents, but only if the relationship was a healthy one.

{¶22} Grandparents did not have any contact with the children from November 2011 until December 13, 2012. On that date, the parties began the first of six agreed upon visitations that concluded in April 2013. Four of the visits took place at restaurants and two of the visits took place at Grandparents' house. Mother was present for all six visits and testified that they were uncomfortable for the children. She testified that, if visitation were to occur, the children would be most comfortable in their own home with Grandparents coming to visit them.

{¶23} Grandparents testified that losing their son was difficult for them, but that they had joined a support group at church and were learning to cope with the loss. They indicated that maintaining a relationship with the children was important to them and that they were willing to make changes in order to make the children more comfortable. For instance, Grandparents agreed that they would either remove or cover the memorial cross they had outside if it was a source of discomfort for the children.

{¶24} Michael Senger testified as the children's guardian ad litem and filed several reports with the court. Mr. Senger spoke with each of the children and observed one visit that took place at Grandparents' home. He testified that each of the children were initially either ambivalent about visitation with Grandparents or in favor of it, but that, by the time of the hearing, all of the children wanted their Mother to supervise any visits that occurred. Nevertheless, Mr. Senger reported that the visit he observed at Grandparents' home was a positive one and the three younger children readily involved themselves in the activities that Grandparents had planned. Mr. Senger specified that the eldest child was "aloof" during the visit and frequently looked to Mother for guidance. Even so, Mr. Senger noted that Mother was appropriate at all times during the visit, encouraged the children, and did not interfere with the visitation. Mr. Senger recommended monthly visitation and indicated that he would support the idea of alternating between Mother's house and Grandparents' house. He opined that visitation would be in the children's best interest.

{¶25} The magistrate also interviewed the three eldest children on the first day of the visitation hearing. The magistrate indicated that I.L., who was nine at the time of the hearing, said she did "'not really'" want to visit with Grandparents because they needed "'time to heal'" and were "'a little bit mean.'" I.L. specified that Grandparents had yelled at Mother after Father died and had pictures of Father in their house. I.L. stated that, if visitation were ordered, she would want one visit every two months at her house with Mother present.

{¶26} The magistrate indicated that H.L., who was eight at the time of the hearing, stated that he was not in favor of visitation because seeing Grandparents made him think about losing Father. He stated that, if visitation were ordered, he would only want to see Grandparents a few times a year at his house with Mother present. Likewise, M.L, who was seven at the time

of the hearing, testified that he did not want to have visitation, but that he would want any visitation that did occur to happen at his house with Mother present. Even so, M.L. stated that he had a good time when he recently visited his Grandparents at their house and his visits with them never made him sad.

{¶27} Having reviewed the record, we cannot conclude that the trial court abused its discretion when it awarded Grandparents one, four-hour visit with the children each month. The children had a great deal of contact with Grandparents before Mother and Father divorced and, even after the divorce, continued to see Grandparents at least twice a week until Father died. *See* R.C. 3109.051(D)(1). Mother fully acknowledged that the children had a loving relationship with Grandparents and enjoyed spending time with them before Father's death. *See id.* Although several unfortunate incidents occurred after Father's death, those incidents took place within a few months of his passing when emotions were running high. Grandparents set forth evidence that they had reached out for help since that time. *See* R.C. 3109.051(D)(9). Additionally, they testified that they would be willing to make any adjustments that might make the children more comfortable, such as moving or covering the memorial cross in their yard.

{¶28} Mother and the children lived within ten minutes of Grandparents, and Grandparents were retired, such that all the visits could be arranged around the children's schedule. *See* R.C. 3109.051(D)(2), (3). Because all four children would visit with Grandparents at the same time, the visits would not cause the children to lose any time with one another. *See* R.C. 3109.051(D)(8). All of the children were in good health, and there was no evidence that Grandparents suffered from any serious health problems. *See* R.C. 3109.051(D)(7), (9). Additionally, there was no evidence that Grandparents had ever been involved in the abuse or neglect of a child. *See* R.C. 3109.051(D)(12). Although Mother

expressed her concern that any visitation with Grandparents was still not healthy for the children, *see* R.C. 3109.051(D)(15), there was evidence that Grandparents acted appropriately with the children at all times during the six visits that took place after these proceedings commenced. There was testimony that one of the six visits the parties had planned during these proceedings had to be rescheduled due to illness. The parties were able to communicate and reschedule that visit without incident. *See* R.C. 3109.051(D)(10).

{¶29} Mr. Senger, the guardian ad litem, testified that the three younger children all appeared to be enjoying themselves during their visit with Grandparents, and that the eldest child, while aloof for much of the visit, also joined in after some time. By ordering the first four visits between the children and Grandparents to take place at Mother's home with Mother present, the court provided for a transitional period that took the children's wishes into account. *See* R.C. 3109.051(D)(6). Although the court ordered that visits beyond the first four would take place at Grandparents' home without Mother being present, the court noted that Grandparents were free to invite Mother to stay. It is clear from the record that all of the parties genuinely care for the children. It was not, therefore, unreasonable for the trial court to expect Grandparents to listen to the children and keep their welfare in mind when deciding whether or not to invite Mother to stay for future visits. Having reviewed the entire record, we cannot conclude that the trial court abused its discretion when it awarded Grandparents visitation. Consequently, Mother's third assignment of error is overruled.

III.

{¶30} Mother's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

HENSAL, J.
WHITMORE, J.
CONCUR.

APPEARANCES:

RENEE J. JACKWOOD, Attorney at Law, for Appellant.

R. J. HELMUTH, Attorney at Law, for Appellees.